Pennsylvania Railroad Company, Appellant, *v.*
Pennsylvania Public Utility Commission.

Argued March 20, 1951. Before RHODES, P. J., HIRT,
RENO, ROSS, ARNOLD and GUNTHER, JJ. (DITHRICH, J.,
absent).

*William F. Zearfaus*, for appellant.

*William J. Grove,* Assistant Counsel, with him *Lloyd S. Benjamin,* Assistant Counsel and *Charles E. Thomas,* Counsel, for appellee.

*Joseph T. Owens,* for intervening appellee.

OPINION BY HIRT, J., July 19, 1951:

In the original complaint filed with Pennsylvania Public Utility Commission, Pittsburgh Plate Glass Company alleged that the increased freight charges on sand which it paid to respondent, Pennsylvania Railroad Company, throughout the period from May 1, 1947, to July 19, 1948, were in excess of the lawful rates under existing tariffs, in violation of §303 of the Pennsylvania Public Utility Law, the Act of May 28, 1937, P. L. 1053, 66 PS §1143. The Glass Company accordingly sought a refund of the amounts paid by it over and above the applicable rates. The shipments involved were of sand in open-top cars from Mapleton, Silica Plant, and McVeytown in the Mapleton district to complainant's factories in Ford City and Creighton, in this State. The complaint was sustained by order of the Commission and the proceeding was set down for further hearing to determine the amount of reparations due the Pittsburgh Plate Glass Company from the respondent railroad. From this order the Pennsylvania Railroad Company appealed. In disposing of the appeal we will continue to refer to the Glass Company as the complainant.

The basic freight rates of The Pennsylvania Railroad Company appear in its Tariff 1268F, Pa. P. U. C. No. 1533. It was agreed that the effective base rate in that tariff on open-top carload shipments of sand from the three named points in the Mapleton District to Ford City and Creighton, in Pennsylvania, was $1.54 a net ton. It was also agreed that the commodity description applicable to the basic sand rate was thus.

stated in that tariff: "Item 5 Sand (Except Sand, Molding, bonded, (naturally or otherwise) and except Ground or Pulverized Sand), in open-top equipment, without tarpaulin or other protective covering. (See Note) Note: Will not apply on Sand processed beyond washing or screening for decolorizing, filtering or water softening". Item 10 of the tariff dealt with shipment of sand in closed car equipment, and was applicable also to molding sand in all kinds of equipment.

The controversy arises from the fact that basic rates on sand in interstate commerce became subject to increases by orders of the Interstate Commerce Commission and these increases were made effective, concurrently on intrastate shipments, by the Public Utility Commission. The order of the Interstate Commerce Commission of December 15, 1946, in a proceeding known as Ex Parte 162, 266 I. C. C. 537 (1946), authorized an increase of 15 cents per ton on "Gravel and Sand—Group 350" and an increase of 20 per cent, subject to a maximum of 30 cents a ton, on "Industrial Sand—Group 392". "Basic freight rates" subject to the order of December 15, 1946 were defined by the Interstate Commerce Commission in Ex Parte 162, as "those now in effect". In that proceeding, Group 350 by reference was defined as "Gravel and sand (other than glass or molding)" and "Gravel; sand, N. O. I. B. N." i.e., Not Otherwise Indexed By Name, and not more specifically provided for in that tariff. Group 392, subject to the order, consisted in "Products of mines" and included "Glass" sand and molding sand.

To enable carriers to take advantage of the increases in intrastate shipments, promptly, Pennsylvania Public Utility Commission by order dated December 10, 1946, permitted Pennsylvania Railroad—on the authority of §308(a) of the Public Utility Law, 66 PS §1148 —to file a special tariff on but five days' notice re-

flecting the increases. As applying to Group 350, referred to in the Interstate proceeding, supra, the tariff filed by appellant with the Pennsylvania Utility Commission pursuant to the above order, in Item 245, (in final amended form as Item 245B) provided: "Sand or gravel, NOIBN, in bulk in open top cars. —Apply 15 cents per net ton" and in Item 246: "Sand or gravel, NOIBN, in bulk in closed cars.—Apply Table 1, (20%), maximum 30 cents per net ton". As to Group 392, Item 247 of the appellant's tariff, as filed with the Commission, provided: "Sand, blast, core, filtering, fire, furnace, foundry, *glass,* grinding, loam, polishing, molding or silica—Apply Table 1, (20%), maximum 30 cents per net ton". (Emphasis added). These were the provisions of appellant's supplemental Special Tariff—Pa. P. U. C. No. A128 on May 5, 1947, and throughout the period involved in the complaint. We will ignore subsequent increases in rates, since they do not affect the principle involved.

The reason for permitting the filing of an amended tariff on less than the statutory notice is thus stated in the order of the Commission here on appeal: "This special permission applied to rates on all commodities and was granted in order to permit the railroad company to take advantage of the increase allowed by the Interstate Commerce Commission in *Ex Parte* 162. It was our intention to permit increases on those classifications of commodities then in effect and not to permit the railroad company under a guise of a general increase allowed by the Interstate Commerce Commission to permit changes in commodity classifications and to thereby depart from the long standing practice in Pennsylvania of fixing the charge for transportation of sand by classifying shipments in open cars and closed cars. This intention is in conformity with the Interstate Commerce Commission order in *Ex Parte* 162 (266

I. C. C. 537) wherein it said—'By basic freight rates and charges are meant those now in effect, whether established by order of the Commission or voluntary out of the petitioning carrier . . .' " The Commission found that appellant did not have a commodity classification covering *glass sand* from Mapleton in effect at the time increases were authorized and accordingly concluded that the shipment of sand, involved here, should have been charged, following Ex Parte 162 increases of the Interstate Commerce Commission, under Item 245 of the new special tariff filed by appellant with Pennsylvania Utility Commission.

In the proceeding before the Interstate Commerce Commission the increases allowed were upon basic freight rates as applied to classifications of commodities "now in effect". And in the present proceeding it undoubtedly was the intention of the Public Utility Commission to apply the same method and to allow the same increases on basic rates as applied to commodity classifications of the then existing Pennsylvania Railroad Tariff 1268F. And it must have been clear to appellant that the Commission allowed the filing of the supplemental tariff on short notice for that purpose alone and not to permit changes in classifications of commodities even to make them conform with those of interstate tariffs. Appellant is chargeable with knowing that what the Utility Commission invited in waiving the 30 days notice required under the statute and standing order, was an increase in tariffs applicable to basic rates then in effect and not increases in charges accomplished by reclassification of a commodity out of a low charge group into one subject to a higher freight rate. Admittedly the amendments contemplated were "tie-in" tariffs and as such were effective only as applied to the commodity classifications of the basic tariff. A tariff providing new rates on new classifica-

tions would have been a new tariff supplanting, and not supplementing merely, the existing tariff.

The sand in the shipments here involved was actually *glass* sand because of its high silica and low iron oxide content. It was suitable for the manufacture of glass but could also be used for many other purposes as well and it had been the policy of the Commission, of long standing, to ignore uses to which sands are adapted and to determine freight rates entirely with reference to the kind of railroad equipment used in its transportation. And in general (with few exceptions based upon special characteristics of single purpose sands) the same rate was applied to sand of all types when shipped in open top equipment and a higher rate for the same sand only when shipped in closed equipment. The former policy of the Commission does not decide the question as to what the Commission actually authorized in the present proceeding. But appellant was familiar with that policy and there is nothing in this record indicating any intention of the Commission to adopt any other basis for determining freight rates on sand.

The mere filing of a tariff change in commodity classifications, on less than statutory notice, did not establish a higher freight rate on glass sand. If unauthorized, as the Commission says it was in this instance, the change did not increase the rates which the railroad could collect from a shipper and the shipper was bound to pay. The provisions of such unauthorized change in existing tariffs may be binding on the railroad when to the advantage of a shipper or consignee obliged to pay freight charges and relied upon by him. But tariffs filed on less than statutory notice become enforceable by a railroad only insofar as they are filed within the terms of the special permission granted by the Commission. In this instance the orders of the Commission indicate that the Special Permission

64

granted by the Commission was not unlimited in scope, and specifically provided: "Neither the said permission nor the filing of said tariffs or supplements with the Commission is to be taken as an approval by the Commission of the prices, charges, rates, fares, tolls or other compensation or the rules or regulations contained in the said tariffs or supplements so permitted to be changed on less than statutory notice, nor are any of the Commission's rules relative to the construction and filing of tariff publications waived hereby, except as otherwise indicated . ."

Appellant did not have a commodity classification covering and including "glass sand" in its basic Tariff 1268F. For that reason the increased rates of Group 392, supra, (20%, with a maximum of 30 cents per net ton) did not apply to the increase tariff filed by appellant. The so-called "industrial list" of Item 247 which included "glass sand" was not a part of the basic tariff and the increases contended for by appellant therefore could not be accomplished by the expedient of re-classification.

Order affirmed.